3-13-16

HON: MR. JOSEPH C. SPERO
Chief MAGISTRATE JUDGE
United States Dist. Court
450 Golden Gate Ave
SAN Francisco, CA. 94102

COPY: U.S. Court
Media
Fam

CASE NO: 15-CV-03949-JCS (PR)

THIRD AMENDED Complaint

in Pro-se. I'm JAMES G. MARLOW
E-32500 Cond. Row
SAN Quentin State Prison
SAN Quentin, CA. 94974

FILED

MAR 17 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

HON Court,

Respectfully Please consider — And
REVIEW These ~~Court~~ late 80s early 90s

Superior Court Exhibits marked, "Exhibit 85."

And Accept if Possible As my Exhibit-A
for Third Amended Complaint 15-CV-03949-JCS (PR)
As to History to show These complaint
concerns have occured in the Past. And
it is reasonable They Are Re-occuring Now
with The CA. Prison Gang All of Them.
Are After me — And They influnce C.D.C.R.
staff And law inforcement.

Very Respectfully yours,   James M. Marlow
                           E-32500  3-13-16

Case3:10-cv-01417-EMC   Document10   Filed06/15/10   Page1 of 66

JAMES G. MARLOW E-32700
CONDEMNED ROW SQ CA.
CV-10-1417- SP.E.M.C.

CV-10-1417-EM

RECEIVED

JUN 15 2010

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

NOW 15-CV-03949- JCS,(PR)
THIRD AMENDED COMPLAINT exhibit "A"

# Exhibit 85

COPY

```
 1   GEORGE A. PETERS
     Attorney at Law
 2   1010 North Ross Street
     Suite 200
 3   Santa Ana, California  92701
     (714) 835-0400
 4

 5   Attorney for Defendant
     JAMES GREGORY MARLOW
 6

 7           SUPERIOR COURT OF THE STATE OF CALIFORNIA

 8                FOR THE COUNTY OF ORANGE

 9

10   PEOPLE OF THE STATE OF CALIFORNIA,) CASE NO:  C-65640
                                       )
11                        Plaintiff,) EX PARTE APPLICATION FOR ORDER
                                   ) REQUIRING SEPARATE AND
12   -v-                           ) INDIVIDUAL TRANSPORTATION TO
                                   ) AND FROM THE ORANGE COUNTY
13   JAMES GREGORY MARLOW,         ) COURTHOUSE FOR ANY APPEARANCE
                         Defendant.) THE DEFENDANT MAY HAVE TO MAKE
14                                 ) IN THIS CASE.
                                   ) (IN-CAMERA HEARING)
15   _____)
```

16                          INTRODUCTION

17      Defendant, JAMES GREGORY MARLOW, through his Counsel by this

18   Application request that this Honorable Court Order that he be

19   transported to his Court appearances in a separate vehicle.

20      Defendant requests this extraordinary relief for the following

21   reasons:

22      a)  Defendant, JAMES GREGORY MARLOW's life is
            endangered by prison gangs and other.
23
        b)  Defendant, JAMES GREGORY MARLOW needs
24          assurances of continual protection from these
            threats so that he may concentrate on his case.
25
        c)  Defendant, JAMES GREGORY MARLOW wants to be
26          separated from all other inmates so that there
            is no possibility of a physical altercation.
27          Such an act of violence, even if justified on
            MARLOW's part, might show up in the penalty
28          phase of this case.

PEOPLE -v- JAMES GREGORY MARLOW
C-65640

### SUMMARY OF FACTS

Defendant, JAMES GREGORY MARLOW, and his female Co-Defendant, CINDY COFFMAN, were housed in the San Bernardino County Jail after their arrest for two capital murders.

Defendant, CINDY COFFMAN's defense strategy was to place the full responsibility for the murders on Defendant JAMES GREGORY MARLOW.

Within a short time after his arrest Mr. MARLOW became aware that Miss COFFMAN was threatening his life.

Early in 1988, San Bernardino Sheriff authorities began monitoring the mail between CINDY COFFMAN and RUEBIN HERNANDEZ, a Mexican Mafia member.

From the mail it appeared possible that in exchange for Miss COFFMAN killing a female witness against HERNANDEZ, HERNANDEZ would have Mr. MARLOW killed, (refer exhibit #3 page 6353-6354 and 6361-6363).

On May 7, 1988, Lieutenant HENRY, San Bernardino Sheriffs' Office, ordered that Mr. MARLOW be housed in isolation and be kept from other prisoners, (refer exhibit #1).

Mr. MARLOW expressed his fears and concern about his safety to his psychologists, Doctor KANIA and Doctor MEZA, (refer exhibit #'s 2 and 4).

A San Bernardino Sheriff, Deputy CORDUA was supplying drugs to Mr. MARLOW and others.  Deputy CORDUA was subsequently arrested. This incident heightened Mr. MARLOW's awareness that the jail Deputies could be bribed or extorted to aid prison gangs in killing

PEOPLE -v- JAMES GREGORY MARLOW
C-65640

him.   Numerous acts of negligence in leaving Mr. MARLOW's cell doors unlocked instilled further paranoia, (refer exhibit #5, report by Sergeant BORNET).

Mr. MARLOW was housed in the isolation area of San Bernardino County Jail with one ARNOLD PORTER.

ARNOLD PORTER was stabbed by other inmates because he would not "hit" Mr. MARLOW, (refer exhibit #'s 6 and 7).

After the completion of the San Bernardino trial Defendant JAMES GREGORY MARLOW was transferred to the Orange County Jail. Before he left San Bernardino Jail he was informed by San Bernardino Sheriffs' Officer Deputy GANINO that Aryan Brotherhood associates were waiting to "hit" him in Orange County.

Because of information supplied by Mr. MARLOW's defense team and others the Orange County Classification authorities isolated Mr. MARLOW before Court Orders were issued requiring that Mr. MARLOW be kept totally separate from other inmates.

Initially Mr. MARLOW's total separation was enforced by I.R.C. Deputies.

In early 1990 a shift change of I.R.C. Deputies apparently resulted in numerous failures to enforce the Total Separation Orders, (refer exhibit #'s 10 through 20).

In February 1990, Mr. MARLOW's Investigator, PATTY SMITH, informed Sergeant VON KNIGHT of a potential problem with inmates JIMMY STEWART from Folsom prison and his childhood friend HENRY MORA a possible "Mexican Mafia" associate, (refer exhibit 10).

/////

PEOPLE -v- JAMES GREGORY MARLOW
C-65640

Unbelievably inmate HENRY MORA was put in a cell right next to Mr. MARLOW on November 2, 1990.   Sergeant BOYER immediately corrected the problem, (refer exhibit 16).

In mid December 1990, on a return trip by bus, Mr. MARLOW was being harassed by "butch looking" female inmates who were screaming and spitting at him.   The female inmates threatened to "cut him". Deputy NORWOOD witnessed this event and told the prisoners to be quiet.   Mr. MARLOW was handcuffed and shackled.   After that incident I was able to persuade Judges BRISENO and RYAN to order individual transportation until this hearing could be held.

At the end of January 1991, Mr. MARLOW received a threatening letter from an alleged female inmate at Orange County Jail, (refer exhibit #22).

Recently an inmate known as "BULLET" NELSON inquired of inmate RICKY BRUCE RICHARDS about Mr. MARLOW's housing location.   NELSON told RICHARDS he is a "made man" who does contract killings. Thereafter "BULLET" NELSON was moved to a cell next to Mr. MARLOW. After a complaint he was moved (refer exhibit #23).

On February 21, 1991, pursuant to a Court Order, Defendant JAMES GREGORY MARLOW was brought to his Court appearances in a separate vehicle, however after his appearance he was returned in a cage on the bus with inmate NORMAN JAMES DEWITT.   This was in violation of the Court Transportation Order and the Court Order requiring Total Separation.

/////

/////

PEOPLE -v- JAMES GREGORY MARLOW
C-65640

### CONCLUSION

Defendant, JAMES GREGORY MARLOW's life is endangered and has been for sometime.  Mr. MARLOW cannot adequately aid in defense of his life without being assured that the jail understands the threats and acts consistently and acts appropriately to those threats.

Specifically, Mr. MARLOW wants no confrontation with any inmate or Deputy.  Mr. MARLOW obviously wants no additional problems in the penalty phase of his case.

Separate vehicular transportation to and from Court will assure his safety, his piece of mind and guarantee that no act of violence occurs that could be used in a penalty trial.

Respectfully submitted


_____
GEORGE A. PETERS
Attorney for Defendant

/////

/////

/////

INTEROFFICE MEMO

DATE 5-7-88

PHONE

FROM Lt. HENRY

TO All PERSONNEL



County of San Bernardino

SUBJECT Housing of Inmate - MARLOWE, James

As of 2345 hrs, 5-7-88, the above inmate is be housed in Marshalling I-50 and is to be considered on PC status. Observe proper security procedures to ensure that Marlowe does not have contact with other inmates. Do not move inmate to other housing without my approval or upon orders from the Captain.

Copies:
Inmate Jacket
Briefing Board

2-1367-000 Rev. 8/86

EXHIBIT "1"

PEOPLE V MARLOW

To:  S. Don Ames, Esq.
     Ray Craig, Esq.

From:  Linda Meza, Ph.D.

Re:  Latest jail interview of Mr. James Marlow

On May 10, 1988, at 2:00pm I interviewed Jim in a jail interview room adjacent to the infirmary.  At this time Mr. Marlow communicated great concern over his last trip from Orange County.

Mr. Marlow stated that upon his return from Orange County, he was placed in housing on G North tier in San Bernardino County Jail. He has on numerous occasions attempted to get different housing as he fears for his life.  Apparently, a Mexican Mafia gang head, by the name of Ruben Hernandez has been threatening Mr. Marlow's life.

According to Mr. Marlow:

"Before I left for Orange County Jail I held on to a food tray and broke a spoon and hid it...I did this to force the guards to put me in isolation so I don't get killed. Ruben Hernandez and Joey Hays are behind me wanting to get off of G North.  They tried to get me to hit a guard but I didn't do it and that's why they are pissed off at me."

"When I got to Orange County Jail I knew Ruben had called someone who let Orange County people know that I was coming.  When I got there I tried to tell a black classification officer about the Mexican Mafia and the Ayrian Brotherhood being after me.  Well, he ignored me and I was put into a program where I had a dayroom and roof by myself.  I was then moved to cell 12, near non-affiliated Mexicans and then the white guys had me moved to cell 4.  I made it...I lived through this...see, this guy was holding knives and gave them to me to hold...I held them until I left so I wouldn't be hurt if someone attacked me."

"When I got back here, to San Bdno. Co. Jail it was, I think, Friday morning and they put me right back to G North.  On the next morning or Saturday morning my cell and two others were open at the same time...in the meantime, lunch came and I told the deputy I wanted to come out of my cell to make a phone call.  They let me

EXHIBIT "2"

out after lunch and opened the other cells, too! In these
other cells are Arnold Porter, a white guy and a guy named
"Lobster." I told the deputy that the other cells were
open and he closed them. Again I tried to tell Arnold and
Lobster if they had a problem with me I'd get out on the
tier with them, one-at-a-time, and try to deal with this.
Well, they said nothing was happening."

"See the problem is is I'm in cell 2 and they're in cells
6 and 7 and about 9 or 10 feet away...and I can hear them
saying 'come night time' they're gonna stab me through the
food tray slot...then dinner gets served. Later on my
water turns on, by itself so I know someone is back
there playing around with the plumbing...so I figure, man
this is my only hope, so I take a part of a hack saw
blade and start sawing at the back of the utility hole,
it's near the sink, so whoever is messing with my water
could hear me and come after me. So I'm sawing like
made and doing it loud and talking to get attention. I
did this for a while and finally they came out of no
where. Deputy DeCecio and Sgt. Baer and said, 'hold
it right there, don't flush that hack saw blade...in
the meantime...the guys on G North had a stolen food
tray and they asked me to make knives out of the tray.
I made one but I kept it because they had better ones
already, so when DeCecio and Baer came I flushed the tray
knife plus the hack saw down the toilet...the blade
didn't go down cause when Sgt. Baer came in he had it
grinning like a possum. So DeCecio and Brinkerdoff (?)
take me to the hole. Later they bring me to this very
interview room and read me my rights and charged me
with attempted escape."

"That's when I told them everything...meaning where
the other blades were hidden in my box...where the
food tray was hidden in an empty call and where a
knife was hidden in someone's box. Then they said,
'okay, we're dropping the charges.' I explained to
them the dart incident, the tray, the fire in my
cell, the hack saw was all because I wanted to get
out of G North."

"So what I'm saying is that I'm doing what I have to
to stay out of G North and I haven't and won't hurt
anyone unless someone tries to kill me and that won't
be the guards...it would be Hernandez and his men who
try to kill me."

3

"The guards are saying that the cells are being left
open because of someone's negligence but 8 months of
negligence don't make sense."

"I told DeCecio that he was one of the guards that
Hernandez wanted me to hit because if I do that and
the cops get me for hitting DeCecio, then Hernandez is
the hero."

"After I told this all to the guards, DeCecio said he'd
write a memo on it and ask that I get P.C...some kind
or whatever protection from these guys.".

"Also, in Orange County I need some kind of protection
because high power inmates are put with the general
population for court appearances and we, high powers,
stay chained and can't defend ourselves against an
attack."

"My conscience is clear with Hernandez and his guys on
G North because I've tried to reason with them. My
conscience is clear with the guards as far as how I
do things to get out of danger in my cell. To this
day I have assaulted no one and want to keep it that
way. My only "assault" was with that paper staple
dart that I threw at a trustee so I could go to the
hole and get away from G North."

"Maybe Mr. Ames could call Sgt. Baer, Sgt. DeCecio and
Capt. Bringerhoff (?) and Lt. Kyritsis to testify that
they know that I'm afraid of getting killed here...
something has got to be done...G North is dangerous."

The interview was terminated at this point. Mr. Marlow appeared to
be genuine in his concern for his life. He was anxious about the
situation and insistent that I take everything down as he spoke. He
said he had nothing to hide as he told this all to the guards. He
stated that he just wants to do his time and wait for his trial to
commence without being under the threat of death in jail.

Attached to this report is a communication to me from Jim Marlow
regarding this issue. Mr. Marlow communicates a desperation in this
letter that should be attended to as soon as possible.

I recommend that Sheriff Tidwell and Judge Turner receive copies of
this report and his letter, dated 5-13-88.

It should be noted that similar concerns are coming from another capital defendant being housed in the San Bernardino County Jail. Apparently, capital inmates are being targeted because they have been earmarked as "having nothing to lose."

Personal discussions with Lt. Kyritsis, Sgt. Pollack have confirmed the inmate's claims of the dominance that Ruben Hernandez has on G North Tier.  Lt. Kyritsis agrees that there is a problem.


Respectfully submitted: _____
                        Linda Meza, Ph.D.

6350

1       THE COURT:  GO AHEAD.

2       MR. WHITNEY:  I WOULD RECOMMEND TO MR. JORDAN THAT

3  THE MOTION LOGICAL WAY TO BEGIN IS WITH -- THE MOST LOGICAL

4  STARTING POINT WOULD BE LIEUTENANT CRYTSIS.

5       MR. JORDAN:  THAT'S FINE.

6       THE COURT:  OKAY.  LIEUTENANT.

7       THE BAILIFF:  PLEASE STAND, FACE THE CLERK, RAISE

8  YOUR RIGHT HAND TO BE SWORN.

9       THE CLERK:  YOU DO SOLEMNLY SWEAR THAT THE TESTIMONY

10  WHICH YOU'RE ABOUT TO GIVE IN THE MATTER NOW PENDING BEFORE

11  THIS COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING

12  BUT THE TRUTH, SO HELP YOU GOD.

13       THE WITNESS:  I DO.

14                    GREG CRYTSIS,

15  CALLED AS A WITNESS BY THE DEFENDANT COFFMAN, BEING FIRST DULY

16  SWORN, TESTIFIED AS FOLLOWS:

17       THE BAILIFF:  PLEASE BE SEATED.

18       THE CLERK:  PLEASE STATE YOUR NAME AND SPELL YOUR

19  LAST NAME FOR THE RECORD.

20       THE WITNESS:  GREG CRYTSIS, C-R-Y-T-S-I-S.

21       THE CLERK:  THANK YOU.

22                    DIRECT EXAMINATION

23  BY MR. JORDAN:

24  Q.  LIEUTENANT, YOU'RE WITH THE SAN BERNARDINO SHERIFF'S

25  DEPARTMENT?

26  A.  YES, SIR.

27  Q.  FOR HOW LONG?

28  A.  APPROXIMATELY FIFTEEN YEARS.

EXHIBIT "3"

Case3:10-cv-01417-EMC   Document10   Filed06/15/10   Page13 of 65

6351

1    Q.   AND HOW LONG HAVE YOU BEEN WITH THE JAIL?

2    A.   ABOUT THIRTEEN MONTHS.

3    Q.   SO THAT WOULD BE APPROXIMATELY --

4    A.   I STARTED THERE IN OCTOBER OF '87.

5    Q.   AND SO MARLOW AND COFFMAN WERE ALREADY THERE WHEN YOU

6    ARRIVED; IS THAT CORRECT?

7    A.   YES, SIR.

8    Q.   DID YOU CONSIDER THEM A SECURITY RISK AT THE FIRST TIME

9    WHEN YOU HEARD ABOUT THEM?

10   A.   YES, SIR.

11   Q.   AND WHAT WAS YOUR FUNCTION AT THE JAIL WHEN YOU FIRST

12   ARRIVED AND NOW IF IT'S DIFFERENT?

13   A.   MY FUNCTION AT THE JAIL WAS A WATCH COMMANDER IN CHARGE

14   OF A SHIFT, AND I WOULD BE ASSIGNED TO VARIOUS SHIFTS FROM

15   SWING SHIFT TO DAY SHIFT.

16   Q.   IS THAT STILL YOUR FUNCTION?

17   A.   YES.

18   Q.   NOW, MR. HAIGHT, OR I GUESS MR. BRUINS, INFORMED ME

19   THAT YOU HAD BEEN, WHAT, DESIGNATED BY THE JAIL TO APPEAR ON

20   THIS MOTION; IS THAT CORRECT?

21   A.   YES.

22   Q.   WHY YOU?

23   A.   WHY ME?

24   Q.   YES.

25   A.   I DON'T KNOW.

26   Q.   WELL, DO YOU HAVE SOME -- DO YOU THINK THAT YOU HAVE

27   MORE INFORMATION THAN ANY OTHER PERSON IN THE JAIL THAT WORKS

28   FOR THE SHERIFF'S DEPARTMENT ABOUT WHY --

6352

1      A.  WELL, AS FAR AS THIS MATTER GOES, WITH THE MONITORING

2  OF THE MAIL, I BELIEVE PROBABLY SO, YES.

3      Q.  HOW DID YOU HAPPEN TO BE THAT PERSON?

4      A.  THE MONITORING OF THE MAIL STARTED WITH ANOTHER CASE

5  AND IT FLOWED OVER TO THIS.  IF YOU WANT ME TO EXPLAIN.

6      Q.  PLEASE DO.

7      A.  WE HAD A SITUATION BACK IN LATE APRIL, THE FIRST OF

8  MAY, OF AN INMATE -- I DON'T KNOW WHETHER I SHOULD GIVE THE

9  NAMES -- MR. RUBEN HERNANDEZ, WHO WAS IN FOR A TRIPLE MURDER

10  AND ALSO ASSOCIATED WITH THE MEXICAN MAFIA.  INFORMATION WAS

11  THAT THE D.A.'S OFFICE WAS GOING TO FILE AN ADDITIONAL -- THIS

12  ADDITIONAL CHARGE ON HIM.  HE WAS NOT AWARE OF IT AT THE TIME.

13  HE WAS IN ON SOMETHING ELSE.  WE HAD INFORMATION THAT THE

14  WITNESS WAS GOING TO TESTIFY.  SHE WAS ALSO IN OUR CUSTODY,

15  AND THE ONTARIO POLICE DEPARTMENT WAS HANDLING THE CASE.

16          ONTARIO, I THINK IT WAS MAY 7TH, THE DISTRICT

17  ATTORNEY'S OFFICE FILED THE ADDITIONAL CHARGES ON MR.

18  HERNANDEZ.  MR. HERNANDEZ AT THAT POINT BECAME A LITTLE BIT

19  MORE AWARE OF WHAT WAS GOING ON.  HE FINALLY FIGURED OUT WHO

20  THE WITNESS WAS.  SHE WAS ALSO IN OUR CUSTODY ON THE FEMALE

21  SIDE.  AND WE WERE APPROACHED BY THE ONTARIO POLICE DEPARTMENT

22  TO MONITOR THE MAIL FOR SECURITY REASONS.

23          WE ALSO HAD INFORMATION OUT THAT THERE WAS GOING TO

24  BE A CONTRACT HIT ON THE WITNESS, AND THEREFORE WE STARTED

25  MONITORING THE MAIL.

26      Q.  ALL RIGHT.  CAN YOU TELL US -- THIS IS A FEMALE INMATE?

27      A.  YES.

28      Q.  CAN YOU TELL US WHO THAT PERSON IS?

6353

1          MR. WHITNEY:  YOUR HONOR, I WONDER IF I CAN
2     INTERRUPT MR. JORDAN.
3          THE WITNESS:  I THINK IT'S RIGHT THERE ON YOUR
4     CHRONOLOGICAL.
5          MR. WHITNEY:  I WAS GOING TO SAY I'VE SUPPLIED MR.
6     JORDAN WITH A CHRONOLOGICAL EVENTS LISTING.  IT'S ALREADY BEEN
7     GIVEN TO YOU THROUGH BARBARA A MINUTE AGO, RIGHT IN FRONT OF
8     YOU THERE, AND THAT CONTAINS THE NAME WHICH IS BEING ASKED.
9     I'D JUST AS SOON NOT MAKE THAT PUBLIC IN THE COURTROOM.
10          MR. JORDAN:  THAT'S FINE.  I SEE THIS SITTING IN
11     FRONT OF ME.  I AM JUST NOW LOOKING AT IT.
12          MR. WHITNEY:  IT'S ON THE FIRST PAGE UNDER MAY 7,
13     1988.
14     Q.  (BY MR. JORDAN)  AT ABOUT THAT TIME IN MAY, 1988, DID
15     YOU START MONITORING MAIL OTHER THAN THAT PERTAINING TO THE
16     HERNANDEZ MATTER?
17     A.  WHAT HAPPENED HERE IN THIS CASE IS THAT WE WERE
18     MONITORING MR. HERNANDEZ'S MAIL AND THEN RODRIGUEZ'S, AND
19     DURING THAT COURSE WE DISCOVERED SOME CORRESPONDENCE AND WE
20     WERE MONITORING TO AND FROM THOSE INMATES.
21          THERE WAS SOME CORRESPONDENCE TO COFFMAN, WHETHER
22     IT'S FROM HER OR -- HE WAS SENDING A LETTER TO HER OR SHE WAS
23     SENDING A LETTER TO HIM, I DON'T REMEMBER.  BUT THAT'S WHAT
24     STARTED IT AND THAT TRIGGERED IT OFF.
25          AND THE CONCERN I HAD THERE WAS THAT THE FACT THAT
26     MISS COFFMAN WAS ON THE FEMALE SIDE, THE POWER THAT MR.
27     HERNANDEZ HAD, THAT MAYBE HE WOULD TRY TO INFLUENCE MRS.
28     COFFMAN TO MAKE THE HIT.  AND ON THE OTHER SIDE, WE HAD MR.

6354

1   MARLOW, WHO WAS HOUSED BASICALLY IN THE SAME AREA WITH MR.

2   HERNANDEZ, AND THERE WAS A LOT OF PROBLEMS THERE, A LOT OF

3   TENSION, AND MR. MARLOW HAD COME TO ME SEVERAL TIMES TELLING

4   ME HE WAS AFRAID.  ON THE REVERSE POINT FEELING THAT MAYBE

5   THERE MIGHT BE A TRADE, HERNANDEZ ORDERING A HIT ON THIS OTHER

6   FEMALE, AND THEN ON THE REVERSE, THAT MAYBE THEY WOULD TAKE

7   CARE OF MR. MARLOW.

8   Q.  ALL RIGHT.  LIEUTENANT, DID YOU -- WERE THERE ANY

9   PEOPLE INVOLVED OTHER THAN THESE DEFENDANTS AND THE HERNANDEZ

10   PEOPLE THAT YOU MENTIONED?

11   A.  AS FAR AS MONITORING THE MAIL?

12   Q.  RIGHT.

13         MR. WHITNEY:  OBJECTION, IRRELEVANT.

14         THE COURT:  OVERRULED.  YOU MAY ANSWER.

15         THE WITNESS:  AS FAR AS MAIL THAT WAS ACTUALLY

16   MONITORED?

17   Q.  (BY MR. JORDAN)  RIGHT.

18   A.  NO.

19   Q.  SO IT'S JUST THESE FOUR PEOPLE?

20   A.  YES.

21   Q.  WERE COPIES OF THE HERNANDEZ CORRESPONDENCE MADE?

22   A.  YES.

23   Q.  AND FURNISHED TO THE D.A. ULTIMATELY?

24   A.  NO.

25   Q.  THAT STILL MAY OR MAY NOT HAPPEN; IS THAT CORRECT?

26   A.  RIGHT.

27   Q.  NOW, WHO GAVE THE ACTUAL ORDER, IF IT WAS AN ORDER, TO

28   MONITOR THE MAIL FROM THESE FOUR INMATES?

6355

1       A.   ORIGINALLY IN THE ONTARIO MATTER WE WERE APPROACHED AND

2   WE WERE ASKED ABOUT MONITORING THE MAIL TO BEGIN WITH, AND WE

3   REQUESTED CLARIFICATION FROM THE DISTRICT ATTORNEY'S OFFICE,

4   MARY FULLER.  I SPOKE TO HER VERBALLY, AND SHE ADVISED ME FOR

5   SECURITY REASONS WE COULD DO THAT.  AND THEREFORE WE DID.

6       NOW, THE OTHER MATTER, ONCE THE OTHER PARTIES WERE

7   INVOLVED, I CONTACTED MR. HAIGHT AND ADVISED HIM OF WHAT WAS

8   TRANSPIRING WITH MR. HERNANDEZ AND THAT WE WERE MONITORING

9   MAIL FOR SECURITY REASONS.  AND THAT AT THIS POINT WE

10  DISCOVERED COFFMAN'S NAME IN ONE TICKLER, AND THEREFORE I WAS

11  REQUESTING THAT WE MONITOR HER MAIL AS WELL AS MR. MARLOW'S

12  REGARDING POSSIBLE SECURITY VIOLATIONS AND POSSIBLE INJURY TO

13  EITHER ONE OF THEM.

14      Q.   AND WHEN DID YOU SO INFORM MR. HAIGHT?

15      A.   AS FAR AS THE SPECIFIC DATE, I DON'T RECALL.  HOWEVER,

16  IT WAS RIGHT AS SOON AS I GOT THE LETTER.  AS A MATTER OF

17  FACT, AS SOON AS I RECALL SEEING COFFMAN'S NAME.  I MEAN I

18  JUST LIT UP WONDERING WHAT THE HECK'S GOING ON.  AND IT WAS

19  RIGHT SOON AFTER THAT I MADE CONTACT WITH HIM.

20      Q.   SO CLEARLY BY THE MIDDLE OF MAY OR ABOUT THE MIDDLE OF

21  MAY?

22      A.   I WOULD SAY AT LEAST BY THEN.

23      Q.   WHAT DID MR. HAIGHT TELL YOU?

24      A.   AS FAR AS SECURITIES REASONS GO WE HAD A RIGHT TO DO

25  THAT, AND I --

26      Q.   AND SO SINCE THE MIDDLE OF MAY MR. HAIGHT KNEW THAT YOU

27  WERE PHOTOCOPYING ALL INCOMING AND OUTGOING CORRESPONDENCE?

28      A.   AS FAR AS PHOTOCOPYING, I DON'T KNOW.  BUT I WOULD SAY

6356

1    THAT HE KNEW WE WERE MONITORING THE MAIL FOR SECURITY REASONS.

2    Q.   WELL, ALL RIGHT.   DID YOU -- FROM THE OUTSET YOU

3    STARTED PHOTOCOPYING THE MAIL, NOT JUST READING IT; IS THAT

4    CORRECT?

5    A.   I DID NOT PHOTOCOPY EVERY SINGLE PIECE OF MAIL.   THERE

6    WAS OTHER LIEUTENANTS INVOLVED.   THERE WERE OTHER LIEUTENANTS

7    THAT ARE ASSIGNED THE WATCH, AND THEY WOULD CONTINUE.   COUPLE

8    OF THE OTHER LIEUTENANTS TOOK IT UPON THEMSELVES TO XEROX

9    EVERYTHING.   MY FEELING WAS I LOOKED THROUGH THE MAIL AND I

10   FELT IF THERE WAS SOMETHING THERE, MAYBE SOMETHING EVEN

11   BORDERLINE, THAT I WOULD XEROX.

12   Q.   I ASSUME THAT WHEN YOU TALKED TO MARY FULLER SHE AT

13   LEAST KNEW THAT YOU WERE GOING TO PHOTOCOPY AT LEAST SOME OF

14   THIS CORRESPONDENCE?

15         MR. WHITNEY:   OBJECTION TO THE FORM OF THE QUESTION.

16   IT'S CALLING FOR SPECULATION UNLESS HE'S ASKING FOR A

17   STATEMENT.

18         THE COURT:   SUSTAINED.

19   Q.   (BY MR. JORDAN)   WELL, YOU SPOKE TO MARY FULLER, DIDN'T

20   YOU?

21   A.   REGARDING THE HERNANDEZ CASE.

22   Q.   RIGHT.

23   A.   NOT REGARDING THIS CASE.

24   Q.   NO, I UNDERSTAND THAT.   BUT WITH THE MONITORING OF

25   HERNANDEZ YOU SPOKE TO MRS. FULLER?

26   A.   YES.

27   Q.   AND DID YOU, IN DISCUSSING IT WITH HER, INDICATE THAT

28   YOU WOULD BE PHOTOCOPYING AT LEAST SOME OF THAT?

6357

1    A.  I DON'T THINK I -- I DON'T RECALL SAYING ANYTHING ABOUT

2    PHOTOCOPYING.  I RECALL JUST MONITORING.

3    Q.  WELL, WHO WAS IT THAT DECIDED TO PHOTOCOPY AS OPPOSED

4    TO PERUSE THE MAIL?

5    A.  WELL, WE TOOK IT UPON OURSELVES, MYSELF THE OTHER

6    LIEUTENANT, AND WE DISCUSSED IT AND WE FELT THAT IF THERE WAS

7    ANYTHING THERE MAKE A PHOTOCOPY OF IT FOR SECURITY REASONS.

8    Q.  WHO WAS THE OTHER LIEUTENANT?

9    A.  LIEUTENANT JOE HENRY.  JOE ON THE OTHER HAND FELT HE

10   SHOULD COPY EVERYTHING.  AND HE DID.

11   Q.  JUST TO MAKE SURE, YOU RIGHT NOW DON'T REMEMBER

12   SPECIFICALLY MENTIONING PHOTOCOPYING, IS THAT CORRECT, TO MR.

13   HAIGHT IN THE MIDDLE PART OF MAY?

14   A.  I DON'T RECALL SAYING PHOTOCOPY.

15   Q.  WAS IT IMPLICIT, IF THAT'S A FAIR STATEMENT, IF YOU

16   UNDERSTAND WHAT I MEAN, WAS IT IMPLICIT IN WHAT YOU SAID THAT

17   IF IT WAS IMPORTANT YOU WOULD PHOTOCOPY IT?

18        MR. WHITNEY:  OBJECTION.  THE QUESTION IS VAGUE AND

19   CALLS FOR SPECULATION.

20        THE COURT:  SUSTAINED.

21   Q.  (BY MR. JORDAN)  WHAT I'M REALLY TRYING TO ASK,

22   LIEUTENANT, IS BASED ON YOUR RECOLLECTION OF WHAT YOU TOLD MR.

23   HAIGHT, IS IT FAIR TO SAY THAT THE UNDERSTANDING CONVEYED

24   CLEARLY CONTAINED THE POSSIBILITY OF PHOTOCOPYING, IF IT

25   WERE --

26        MR. WHITNEY:  SAME OBJECTION.

27        THE COURT:  I DON'T KNOW HOW YOU CAN -- YOU'VE GOT

28   TO FIND OUT WHAT WORDS WERE SAID, AND IT'S SORT OF A

6358

1    CONCLUSION WE CAN DRAW WHETHER THERE WAS ANYTHING IMPLICIT IN

2    THAT STATEMENT.

3           MR. JORDAN:  WELL, YOUR HONOR, SINCE NO WITNESS THAT

4    I KNOW OF IS COMPELLED TO USE THE EXACT WORDS BUT RATHER TO

5    CONVEY THE MEANING, AND OF COURSE THIS IS A MUCH MORE SUBTLE

6    ISSUE THAN, YOU KNOW, DID YOU SEE THE GUY GO IN THE WINDOW OR

7    SOMETHING, BUT I CERTAINLY THINK WITH THE LIEUTENANT HERE THAT

8    THAT QUESTION IS REASONABLE IF HE CAN ANSWER IT.  I DON'T KNOW

9    WHAT HIS ANSWER WOULD BE.

10          THE COURT:  IF YOU WANT TO ASK HIM WHETHER ANYTHING

11   WAS SAID AT ALL ABOUT THE PHOTOCOPYING OR KEEPING A RECORD

12   ANYTHING OF THAT SORT.

13      Q.  (BY MR. JORDAN)  WAS ANYTHING AT ALL SAID BY YOU IN MID

14   MAY TO MR. HAIGHT CONCERNING MAKING COPIES, WHETHER IT'S

15   DIRECT OR IMPLICIT OR ANYTHING THAT WOULD HAVE CONVEYED THAT

16   THOUGHT TO MR. HAIGHT THAT YOU RECALL?

17      A.  I DON'T RECALL.

18      Q.  WHEN DID YOU FIRST BECOME AWARE THAT THE OTHER

19   LIEUTENANT, HENRY, WAS PHOTOCOPYING SOME OF THE MATERIAL?

20      A.  PROBABLY THE NEXT DAY.

21      Q.  THE NEXT DAY?

22      A.  AS A MATTER OF FACT, I SPOKE WITH HIM IMMEDIATELY ONCE

23   WE GOT THE OKAY TO.

24      Q.  DID YOU SPEAK TO ANYONE ABOUT PHOTOCOPYING THE MATERIAL

25   IN MAY OTHER THAN -- WELL, ANYBODY AT ALL THAT YOU DO

26   REMEMBER, STILL BACK IN MAY?  LET ME REPHRASE THAT.

27          WHEN DID YOU FIRST HAVE COMMUNICATION WITH ANYBODY

28   FROM THE DISTRICT ATTORNEY'S OFFICE, INCLUDING MR. BRUINS,

6359

1    CONCERNING PHOTOCOPYING THIS MAIL?

2    A.  WELL, BRUINS WAS AWARE OF IT.  HE HAD COME OVER ON A

3    NUMBER OF OCCASIONS, AND HE KNEW THERE WAS A FILE GOING AS FAR

4    AS MARLOW AND --Coffman.

5    Q.  SO WHEN TO YOUR KNOWLEDGE DID MR. BRUINS FIRST KNOW FOR

6    CERTAIN THAT COPIES WERE BEING MADE?

7    A.  THAT I DON'T RECALL.

8    Q.  CAN YOU INDICATE THAT PROBABLY BY JUNE OR JULY AT THE

9    LATEST?

10       MR. WHITNEY:  IT'S CALLING FOR SPECULATION.

11    Q.  (BY MR. JORDAN)  WELL, DO YOU KNOW?

12       THE COURT:  OVERRULED.  YOU MAY ANSWER.

13       THE WITNESS:  IF I CAN REFER TO SOME OF THE DATES ON

14    THIS.

15    Q.  (BY MR. JORDAN)  PLEASE DO.

16    A.  I LOOK AT AUGUST 12TH, AND THAT WAS THE DATE THAT

17    REALLY STOOD OUT BECAUSE OF THE ESCAPE ATTEMPT.  WE SAW BARRY

18    BRUINS AT THAT TIME AND JUST PRIOR TO THAT.  BUT AS FAR AS

19    SAYING IT WAS IN JUNE OR JULY, I CAN'T SAY.

20    Q.  BUT YOU WOULD SAY IT WAS AT LEAST PRIOR TO AUGUST 12TH?

21    A.  YES.

22    Q.  HOW ABOUT LIEUTENANT SMITH?  I ASSUME YOU KNOW WHO

23    LIEUTENANT SMITH IS -- EXCUSE ME, SERGEANT.  I'M HAVING

24    TROUBLE WITH RANKS HERE.

25       WELL, DID YOU DISCUSS WITH HIM THIS COPYING?

26    A.  I THINK IT WAS ABOUT THE SAME TIME.  HE KNEW WE WERE

27    MONITORING THE MAIL FOR SECURITY REASONS.

28    Q.  HE ALSO KNEW THAT COPIES WERE BEING MADE?

6360

1   A.  I BELIEVE HE DID.

2   Q.  DID YOU PERSONALLY SPEAK WITH MR. HAIGHT AT SOME TIME

3   AFTER THE MIDDLE OF MAY OF THIS YEAR CONCERNING THIS MATTER?

4   A.  NO, OUR ONLY CONTACTS WERE WITH BRUINS.

5   Q.  DO YOU RECALL?

6   A.  CAN YOU REPHRASE THE QUESTION AGAIN?

7   Q.  YES.

8   A.  OR REPEAT THE QUESTION.

9   Q.  WHEN WAS THE FIRST TIME THAT YOU HAD COMMUNICATION WITH

10  MR. BRUINS CONCERNING GIVING HIM COPIES OF THIS

11  CORRESPONDENCE?

12          MR. WHITNEY:  ASSUMES FACTS NOT IN EVIDENCE THAT HE

13  EVER HAD SUCH A CONVERSATION ABOUT GIVING BRUINS ANY COPIES.

14          MR. JORDAN:  HE SAYS HE ONLY TALKED TO BRUINS AND

15  THE D.A. GIVING COPIES.

16          THE COURT:  ASSUMES FACTS NOT IN EVIDENCE.

17  Q.  (BY MR. JORDAN)  DID YOU EVER TALK TO BRUINS ABOUT

18  PROVIDING COPIES?

19  A.  I DON'T BELIEVE SO.  IF YOU WANT TO GET TO THE POINT

20  HOW HE GOT THE COPIES --

21  Q.  (BY MR. JORDAN)  HOW DID HE GET THE COPIES?

22  A.  ONCE AGAIN, IT WAS ON MY DAY OFF, AND THE NEXT DAY I

23  CAME IN AND THEY WERE ALL GONE.  AND APPARENTLY THE D.A. GOT

24  THEM, AND THAT'S WHEN THIS ALL CAME ABOUT.

25          THE COURT:  WHEN WAS THAT?

26          THE WITNESS:  APPARENTLY -- THIS WAS JUST RECENTLY.

27  LIEUTENANT DVORAK WAS ON DUTY, AND I BELIEVE SERGEANT SMITH

28  HAD COME OVER AND DVORAK GAVE SERGEANT SMITH THE FILES WE HAD.

6361

1   FOR WHAT REASON, I DON'T KNOW.

2       Q.  (BY MR. JORDAN)  SO YOU DON'T -- YOU CAN'T ANSWER THAT

3   QUESTION BECAUSE YOU WEREN'T THERE?

4       A.  NO.

5       Q.  I WAS UNDER THE IMPRESSION THAT MR. SMITH GOT THEM A

6   MONTH OR SO BEFORE THEY WERE DISCLOSED.  THAT'S NOT TRUE?

7       A.  NOT TO MY KNOWLEDGE.  MY UNDERSTANDING IS IT WAS ON MY

8   DAYS OFF, I THINK IT WAS THIS PAST WEEK.  AND I HEARD THAT'S

9   WHEN IT HAPPENED.  I THINK IT WAS EITHER A THURSDAY OR FRIDAY

10  OF THIS LAST WEEK.

11          MR. JORDAN:  I HAVE NOTHING FURTHER.

12          THE COURT:  ANY QUESTIONS, MR. CRAIG?

13          MR. CRAIG:  YES.

14          MR. WHITNEY:  DID YOU EVER --

15          THE COURT:  LET MR. CRAIG --

16          MR. WHITNEY:  I'M SORRY.  I THOUGHT YOU SAID

17  WHITNEY.

18                  CROSS EXAMINATION

19  BY MR. CRAIG:

20      Q.  LIEUTENANT, THIS WAS BACK IN MAY YOU WERE FIRST ALERTED

21  TO A POSSIBILITY OF A POSSIBLE HIT ON THIS FEMALE PRISONER

22  WHOSE NAME YOU INADVERTENTLY MENTIONED?

23      A.  END OF APRIL, FIRST OF MAY.

24      Q.  AND YOUR CONCERN WAS THAT THERE WAS GOING TO BE A HIT

25  ON THIS WITNESS ON THE FEMALE SIDE AND THERE MIGHT

26  RECIPROCALLY BE A HIT ON MR. MARLOW OVER ON THE MEN'S SIDE?

27      A.  THERE WAS A POSSIBILITY, YES.  MORE THAN THAT.

28      Q.  DID YOU HAVE INFORMATION THAT THESE POSSIBILITIES

6362

1    EXISTED?

2       A.   IN THE MONITORING OF THE MAIL?

3       Q.   YES.

4       A.   THERE WAS SOME INFORMATION RELAYED ABOUT THAT.  AND

5    ALSO THE POSSIBILITY WAS THERE BECAUSE I HAD SEVERAL CONTACTS

6    WITH MR. MARLOW PRIOR TO THIS.   THERE WAS A CONSTANT PROBLEM

7    IN THE HIGH SECURITY TANK.

8       Q.   IN YOUR MONITORING OF THE MAIL, YOU DISCERNED THAT MR.

9    MARLOW WAS A POTENTIAL VICTIM FROM THE MAIL?

10      A.   WAS A POTENTIAL VICTIM?

11      Q.   YES, FROM THE MAIL.

12      A.   THERE WAS A LETTER THAT MR. MARLOW SENT TO COFFMAN, I

13   BELIEVE IT WAS DATED MAY 11TH, AND IT APPEARING THAT MR.

14   MARLOW WAS VERY UPSET WITH COFFMAN.  BUT IT APPEARED TO HIM

15   THAT SHE WAS COMMUNICATING WITH MR. RUBEN HERNANDEZ AND JOEY

16   HAYS, MR. HAYS BEING AN ASSOCIATE OF MR. HERNANDEZ, THAT THEY

17   WERE POWERFUL PEOPLE, AND HE THOUGHT POSSIBLY SHE WAS WORKING

18   WITH THEM TO HARM HIM. Back stabbers with Deputies- Is Powerful.

19      Q.   IN ADDITION TO CORRESPONDENCE OF MR. HERNANDEZ, WERE

20   YOU ALSO MONITORING MR. HAYS' CORRESPONDENCE?

21      A.   NO.

22      Q.   IF YOU RECALL, DID MR. HERNANDEZ EVER MAKE REFERENCE TO

23   MR. MARLOW IN HIS CORRESPONDENCE?

24      A.   SPECIFICALLY, I DON'T RECALL. Yeah Right..

25      Q.   WERE THOSE LETTERS TURNED OVER TO MR. HAIGHT, THE

26   HERNANDEZ LETTERS?

27      A.   NO.

28      Q.   WHERE WOULD THEY BE NOW?

6363

1    A.  THE LETTERS ON HERNANDEZ?

2    Q.  THE HERNANDEZ CASE.

3    A.  OKAY.  I JUST RECALL ON THAT MATTER THERE, HERNANDEZ

4  WAS MOVED FROM OUR FACILITY ON AUGUST, AND WE KEPT HAVING SUCH

5  A VOLUME OF MATERIAL AND WE CONTACTED ONTARIO, I BELIEVE IT

6  WAS LAST MONTH SOMETIME, AND ASKED THEM ARE WE STILL CONCERNED

7  HERE AS FAR AS SECURITY OR THIS HIT.  AND AT THAT POINT UPON

8  THE DISCUSSION THEY FELT THERE WAS NO NEED TO MONITOR ANY

9  FURTHER, BECAUSE HERNANDEZ WAS GONE AND RODRIGUEZ WAS GONE.

10  SO WE THREW THEM AWAY.

11    Q.  MR. HERNANDEZ WAS TRANSPORTED TO GLEN HELEN ON AUGUST

12  15TH; IS THAT CORRECT?

13    A.  YES.

14        MR. CRAIG:  THANK YOU.  NOTHING FURTHER.

15        THE COURT:  MR. WHITNEY.

16                CROSS EXAMINATION

17  BY MR. WHITNEY:

18    Q.  YOU READ THE NOTICE OF MOTION PREPARED BY MR. JORDAN IN

19  THIS CASE REGARDING THE ISSUE BEFORE US, OR DID YOU?

20    A.  I DON'T RECALL.

21    Q.  ESSENTIALLY THE THRUST OF THE MOTION IS THAT SOMEHOW

22  THE PROSECUTION ENGAGED IN A DIABOLICAL AND REPREHENSIBLE

23  SCHEME TO AVOID GIVING UP THE MATERIAL WHICH IS IN QUESTION

24  HERE TO THE DEFENSE ATTORNEYS.  ASSUMING THAT TO BE THE THRUST

25  OF THE MOTION, WHAT IS YOUR COMMENT ON THAT?

26    A.  OUR MAIN CONCERN WAS SECURITY, AND ESPECIALLY THE RUBEN

27  HERNANDEZ MATTER WITH THE INFLUENCE HE HAD ON OTHER INMATES

28  AND THAT THE MURDERS WERE GOING ON AND THE VIOLENCE THAT WAS

MICHAEL E. KANIA, Ph.D.

CLINICAL PSYCHOLOGY

303 EAST VANDERBILT WAY
SUITE 260
SAN BERNARDINO, CA 92408
TELEPHONE: (714) 381-1041

December 4, 1988

Mr. Ray Craig
Ms. Cheryl Andre
505 N. Arrowhead, Suite 304
San Bernardino, CA 92401                RE:  James Gregory Marlow

Dear Ms. Andre and Mr. Craig:

At your request, I am writing to summarize my recent contact with Mr. Marlow, with specific reference to his present state of mind.

I met with Mr. Marlow while he was in the San Bernardino County Jail on 11-23-88. At that time I spent approximately two hours with him. During this time, he relayed a number of concerns to me. It was apparent that he was quite worried and anxious as he discussed recent incidents in the jail. He was concerned that his life was in danger.

Mr. Marlow cited several areas of concern, all of which led him to believe that his life was in danger. First of all, he indicated that his co-defendant, Ms. Cindy Coffman, has at least two boyfriends in the jail, and that these boyfriends have indicated to Mr. Marlow that they may attempt to kill him. MR. Marlow has had written contact with Ms. Coffman, containing information that confirms his impression that he is in danger. Mr. Marlow is of the opinion that should he be assaulted by other inmates. deputies would not protect him. His reasoning for thsi belief is based on incidents in the past where cell doors have been left open, and there have been times when more than one high-powered inmate has been released from his cell at any given time, Other times, Mr. Marlow's cell door has been left unlocked while more than one inmate was out of his cell. In this regard, Mr. Marlow fears "premeditated negligence."

The second area of concern focuses on the relationship between Mr. Marlow and the deputies in the jail. The conflict surrounds Mr. Marlow's use, along with one other high-powered inmate, of amphetamines over a period of time in october. As a result of the ensuing psychological problem he experienced, Mr. Marlow was treated in the jail infirmary, and later at San Bernardino County Medical Center. The fact that he had been injecting amphetamines over a period of days led to a Sheriff's investigation. Mr. Marlow initially told deputies the names of deputies involved. Later, feeling that he might be the object of retribution, both by other inmates and by deputies involved, he retracted his statements. Nevertheless, he is fearful that because he provided this information, action will be taken against him. In particular, he fears that deputies will intentionally place other inmates into cells directly adjacent to his--inmates such as Mr. Coffman's boy-friends, who are attempting to kill him. In this regard, Mr. Marlow has asked that he be placed in an isolation cell in the protective custody section of the jail. He indicates that upon making this request, he was told by the Sheriff's Department in Judge Turner's Court, that placement in this section of the jail would nto be possible, as there are no screens on the cell doors.

EXHIBIT "4"

Ex 85, Page 1458

Mr. Ray Craig
Ms. Cheryl Andre
Page 2
December 4, 1988

Mr. Marlow's desire for alternative placement in the jail stems from the fact that he is frequently unable to sleep at night due to his fears, and he must stay awake during the day for his courtroom appearances. This leaves him little time for sleep and no time to deal with issues related to his case (e.g., completing work and providing information that has been requested by his attorneys). He goes so far as to request that he be placed in Med-Iso (once again, so that he can be certain that he will not be harmed by other high-powered inmates), even though this would mean spending all of his time locked in this spartan environment.

While Mr. Marlow also indicates a number of other less serious concerns, he also notes constant harassment from teh deputies. As information is published in the paper daily, deputies walk by his cell, calling him derogatory names. His fear is that because of their attitude twoards him, should there be any assault on him by another inmate, deputies would look the other way.

While one might expect to find complaints of mistreatment from an individual in Mr. Marlow's situation, there seems to be a strong element of reality to his concerns. For example, there is no question that he was diagnosed as suffering from an amphetamine psychosis, and this occurred while he was in the high-powered custody, suggesting that the drugs were, in fact, brought to him. This gives some credence to his fear that deputies might be involved. My own observation during this most recent interview was that there had been significant changes in the way Mr. Marlow was being handled by the deputies. In the past, Mr. Marlow has been brought to the interview room, wearing shackles, only after I have arrived at the jail. However, on this most recent occasion, he had been brought down prior to my arrival and was being held in a Med-Iso cell, approximately 30 feet from the interview room. He was not wearing shackles or handcuffs when he was moved from the Med-Iso cell to the interview room. This was in stark contrast to previous meetings, when deputies were reluctant to allow Mr. Marlow in the room wearing shackles, with his hands handcuffed in front of, rather than behind him. On at least one occasion in the past when he requested to be taken to the restroom, again in a Med-Iso room only a short distance away, he was shackled and handcuffed to move this short distance. This was done by deputies who were stationed outside the interview room throughout the evaluation. On the present occasion, no deputies were stationed outside the interview room and Mr. Marlow was neither shackled nor handcuffed. One hour into the evaluation, the interview was interrupted by a deputy who asked for the examiner's key. He was, in effect, asking that I bel locked in the interview room with Mr. Marlow, with no way to exit, and no deputy outside the interview room. When I questioned this, as this had never been requested of me in the past, the deputy stated only that he had heard that a female psychologist was in the interview room with Mr. Marlow. As I was not female, he allowed me to retain the key. In spite of his concerns, it was noted that he made no comment about the absence of a deputy outside the interview room, or the fact that Mr. Marlow was neither shackled nor handcuffed.

Mr. Marlow's concerns and anxieties appear, at least to some degree, to be reality-based. The affect of this great concern significantly impairs his ability to focus his attention on the events of his trial. Instead, he spends his nights attempting to stay awake to protect himself from any possible harm. In my conversations with each of you, you have indicated that he has been unable to provide information you have requeted of him.

Mr. Ray Craig
Ms. Cheryl Andre
Page 3
December 4, 1988

    While there are certainly cases in the jail where individuals attempt to present problems in a manipulative way to improve their housing situation, this does not appear to be the case with Mr. Marlow.  He is requesting that he be placed in a similarly restrictive cell, but one that is away from inmates whom he feels might attempt to harm him.  He asks that he be placed in protective custody, and that he be handled in a manner similar to the manner in which his co-defendant, Ms. Coffman, is being handled.  He feels that if this were the case, he would not be in as great a danger as he is now, and he would be able to concentrate on aiding his attorneys during his trial.

    Should you have any additional questions regarding my recent contact with Mr. Marlow, please do not hesitate to contact me.

    Sincerely,

    Michael E. Kania, Ph.D.
    Clinical Psychologist
    License No.:  PY 6583

THE main THING WAS DEPUTIES UNLOCKING DOORS
    FOR 3 & 4 GUY'S AT A TIME WITH KNIVES
ON THE END OF BROOM STICKS...
    AFTER BEING GIVEN DRUGS WITH POISON
IN THEM... THEY WERE TO KILL ME WITH PORTER
TAKEING THE BLAME FOR IT..
    YES, I Told A FEW People, BUT NEVER
BROUGHT THESE THINGS OUT ON THE STAND TO
    BETTER MY SELF.

THIS WAS MY only CORSE TO COVER MYSELF
    IF OTHERS WERE HURT TRYING TO
KILL ME...

| DATE | February 5, 1989 |
| FROM | R. BONNET, Sergeant<br>Central Detention Center |
| TO | BLAKE BRINKERHOFF, Captain<br>Central Detention Center |

INMATES Jacket

County of San Bernardino

| SUBJECT | GRIEVANCES FROM INMATE HARLOW, JAMES<br>BKG. #8611300724, DATED 1/22/89, 1/28/89 |

ASSIGNMENT:

On 1/23/89, I was assigned by Lt. Dvorak to investigate a grievance form turned in by inmate James Harlow.

INFORMATION--GRIEVANCE DATED 1/22/89:

After reading the grievance, I was unclear as to what the exact nature of the grievance was. The grievance dealt with the proper security of Harlow, and Deputy Cordua's arrest was mentioned. Being unclear about the nature of the grievance, I talked with inmate Harlow. I told Harlow that I would interview him about the grievance, and that it would not be answered in the five-day limit. This conversation took place on 1/25/89.

When we talked, Harlow said that he hated to write the grievance, that things could be worked out and we could handle most of the problems.

INFORMATION--GRIEVANCE DATED 1/28/89:

On 1/28/89, I received a second grievance from inmate Harlow. Since I had yet to talk with Harlow, I took the second grievance. After reading the second grievance and seeing that it dealt with similar issues, I talked with Harlow and told him that I would answer both grievances as one, and that I would interview him later that evening. I also told him that I was unclear as to what his grievance was. I also told Harlow that I would not have these grievances answered under the five-day rule.

12-1387-000 Rev. 9/85

EXHIBIT "5"

Grievances from Harlow
Page Three

PROBLEM #1:

Harlow does not want to get involved in the investigation
involving Deputy Cordua. According to Harlow, to date, he
has yet to be contacted by anyone from the Sheriff's
Department regarding Deputy Cordua. It was explained to
Harlow that he has the ability to refuse questioning in
this matter, citing the Fifth Amendment, if he has any
involvement or information. *Deputie Faccing charges - Due To*
*getting involved in Drugs and hits.*
*↑ I Never Testified But Deputie Did sell To*
PROBLEM #2:      *under cover I.A. outside The Jail.*
                 *Because of Arnold Porter...*
This facility is aware of the possible contract on Harlow,
and he is housed, moved and transported, with the
classification of a high security, high risk, segregated,
high escape risk inmate. Harlow is not housed with any
inmates he listed as being possibly involved, and most are
no longer at this facility, i.e., Lewis, Hays and
Hernandez.

PROBLEM #3:

Harlow is correct that he found two doors unsecured when
being placed in the marshaling isolation cells on two
separate occasions. The deputies have been advised to
check the doors, paying special attention when showering
Harlow in the marshaling cells. When Harlow is locked in
a single cell in marshaling awaiting court, open cells can
occur as needed for showers, exercise and phone calls.
*Door- Looking Closed - That were unlocked where*
PROBLEM #4:  *Inmates lived and were waiting for my shower to make*
             *Hit.*
In regards to an isolated visit, this is denied. Visiting
will continue per the existing policy. Isolated visits
will continue at 1930 hrs. Wednesday, Thursday, Friday,
Sunday and Saturday at 1230 hrs. Three inmates or less
will be in bays 52-68, four or five inmates will be in
bays 18-51. These bays can accommodate inmates utilizing
the existing hooks for security.

PROBLEMS #5:

In regards to being pulled for court on Friday, Sgt.
Gorgei, the transportation sergeant, checked the dummy
warrant himself, and it listed Harlow for court on Friday.
Harlow was pulled for court and transported per policy.

5711 Magnolia Avenue • Riverside, CA 92506 • (714) 788-1988

July 17, 1989

Mr. Ray Craig
Attorney at Law
505 N. Arrowhead Ave., Ste. 304
San Bernardino, CA  92401                    San Bernardino County
                                              Jail Housing
Ms. Cheryl Andre
Attorney at Law
2020 Union Street
San Francisco, CA  94123

Re:  James Gregory Marlow

Dear Defense Team:

On July 17, 1989, this Investigator received a telephone call from
James Gregory Marlow at the San Bernardino County Jail, (approxi-
mately 11:00 a.m.)  After a few minutes, Mr. Marlow asked this In-
vestigator if she would like to speak with Inmate Arnold Porter,
as Mr. Porter had asked to speak with this Investigator.  I a-
greed, and Mr. Porter asked this Investigator how I was and what
was I doing?  We spoke for several minutes on the telephone.  Then
Mr. Porter stated that Mr. Marlow "wants to talk to you now", and
Mr. Marlow got back on the telephone.

At that time, Mr. Marlow stated "see, we are both out of our cells
at the same time".  This Investigator then asked Mr. Marlow who
the Officer was that had allowed both inmates' doors to be un-
locked.  Mr. Marlow explained that when Deputy Rozzo came by with
the lunch trays, Mr. Marlow was out on the tier and then went to
his cell, closing his door for the Deputy to secure.  Instead,
Deputy Rozzo served Mr. Marlow and Mr. Porter their lunch, and
then unlocked Mr. Porter's cell door without checking the status
of Mr. Marlow's door.  After opening Mr. Porter's door, (approxi-
mately 10:30 a.m.), Deputy Rozzo left the area.

This Investigator then telephoned Captain Hanson at the San
Bernardino County Jail, to inform him of the breach in security
and possible danger to Mr. Marlow.  After explaining what had tran-
spired, Captain Hanson asked this Investigator to hold on the tele-
phone line, and when Captain Hanson came back on the line, he told
this Investigator that he had sent a Lieutenant to 2nd ISO to con-
firm that both Mr. Marlow and Mr. Porter were out of their cells.
This Investigator then informed Captain Hanson of the problems re-
ported by Mr. Marlow with Deputy Rozzo, on July 7, 1989.  Mr.
Marlow had told this Investigator that Deputy Rozzo had told Mr.
Marlow that he was working for the Mexican Mafia, implying that he

LICENSED • State of California • AA 009938 • PA 008995

FOR YOUR INFORMAT

EXHIBIT "6"

would assist in Mr. Marlow being killed. Deputy Rozzo also told
Mr. Marlow that he should have gotten stabbed instead of Mr.
Porter. This comment was made in front of Inmate Curt Turner.
Captain Hanson assured this Investigator that he would look into
this matter immediately, and then get back to this Investigator.
This concluded our telephone conversation.

Within minutes, this Investigator received another telephone call
from Inmate Marlow, who stated a Lieutenant had come to 2nd ISO to
verify both Mr. Marlow and Mr. Porter's cells were open. This In-
vestigator told Mr. Marlow that I was waiting for a call from
Captain Hanson, so we concluded our conversation.

By 11:30 a.m., Lieutenant Kryitsis of the San Bernardino County
Jail, telephoned this Investigator stating that there would be an
in house investigation into today's incident, as well as the com-
ments made by Deputy Rozzo to Mr. Marlow. Lieutenant Kryitsis as-
sured this Investigator that each officer would be made aware of
this incident, and they should not assume because a door is closed
that said door is locked. Lieutenant Kryitsis also stated both
Mr. Marlow and Mr. Porter will be interviewed regarding Deputy
Rozzo's comments.

This Investigator also asked Lieutenant Kryitsis if they were
still using the cell between Mr. Marlow and Mr. Porter for dis-
ciplinary actions, as purported in an earlier communication be-
tween this Investigator and Lieutenant Kryitsis. Lieutenant
Kryitsis told this Investigator that there had been a change in
policy, and that the middle cell is not to be used at all. This
Investigator then asked Lieutenant Kryitsis about the possibili-
ties of having a television installed in the 2nd ISO as a means
of entertainment for both Mr. Marlow and Mr. Porter, since they
are not being housed there for disciplinary action, but as high
security protective custody inmates. Lieutenant Kryitsis stated
a television is a privilege that should be earned. (It should be
noted that since both Mr. Marlow and Mr. Porter have been housed
in 2nd ISO, they have obeyed the rules, and have remained dis-
ciplinary-free for some time.) Also if Mr. Marlow could be housed
in G-North or Protective Custody, he would have access to a tele-
vision. However, Mr. Marlow has been denied a move from 2nd ISO
to G-North or Protective Custody. Lieutenant Kryitsis did agree
to check with Captain Hanson regarding having a television in-
stalled in 2nd ISo, however, he was not very encouraging.

FOR YOUR INFORMATION

# 6

## ROBERT D. BOSIC & ASSOCIATES

### Investigation and Security
5711 Magnolia Avenue - Riverside, CA 92506

August 22,1989

MR. RAY L. CRAIG                                    INTERVIEW WITH
Attorney At Law                                     ARNOLD PORTER.
505 N. Arrowhead Ave #307
San Bernardino, CA 92401                            San Bernardino County
                                                     Jail Housing

Re: JAMES GREGORY MARLOW

Dear Defense Team:

On 8-22-89 this investigator traveled to the San Bernardino County Jail for the purpose of interviewing Inmate ARNOLD PORTER regarding problems with Inmate JAMES GREGORY MARLOW.
According to Inmate Porter there have been several occasions that inmates have approached Porter regarding Inmate James Marlow.
Inmate Porter was to "hit" Marlow several months ago, due to his failure to complete this task inmate Porter was stabbed.
After inmate Porter was stabbed he informed a deputy that he had been stabbed because he failed to complete the "hit" on inmate Marlow.
Once inmate Porter was released from the hospital and returned to the San Bernardino County Jail he was housed in the same location as inmate Marlow.
Inmate Porter continued to receive pressure from inmates regarding inmate Marlow.
Then in 7/89 or 8/89 Deputy Brandon brought inmate Perez AKA: Magoo to 2nd ISO at approximately 11:00 P.M. to speak with inmate Porter.  Inmate Perez told inmate Porter if he took care of Marlow that Porter would be in good with the other inmates.
Inmate Porter doesn't want anything to do with Perez or Marlow.
According to jail personnel inmate Perez carries alot of weight within the Jail population.
Inmate Porter also verifies that cell doors have been left open by jail staff, making it possible for inmate Marlow to be exposed to possible danger.
Inmate Porter also verified that Deputy Cordua had been supplying both he and inmate Marlow with "speed".  Inmate Porter also related that another deputy made the comment to him that "he should have gotten Marlow". It is inmate Porter wish to be left alone and not be involved with either side of this situation.

This concludes this report.

PATTI SMITH,
INVESTIGATOR

EXHIBIT "7"

INVESTIGATOR    REPORT    To MISS. PATTi SMITH.

Orange County Jail
I.R.C.

JAMES G. MARLOW #1140812 (Ad-Seg PC.) ( J-3 cell #1 )   DATE 1-6-90
DR.NO      S.S.     HOUSING

At About 3:30 PM I WAS called out of my cell FOR

A visit— Through The Day Room of Sector J-3

while inmates in The unit were having Dayroom.

...upon leaving The outer door of The sector

while awaiting For The Buzzer Door by The guard

station To Open. To go To said visit.

The Buzzer Door To Sector (one # 1) WAS

opened. where main line white wrist band

inmates are housed and were having Dayroom.

After About (Two # 2) minutes, The Door

Near The guard station was Buzzed Open.

I WAS Then Told By Deputies in The

guard station To visit in Both, (# Two.#2) Near

main line inmates, and other Non Lock Down

seg PC's.

At This Time. I advised The Deputies of how

visiting has been going For (Four # 4) Months

up To This Point.

That I WAS A P.C. Ad-Seg. Total Lock Down

inmate and was To Be kept Apart From.

others at all Times. As I have Been up until

This Point, Placed into Both (# one—#1) or (Nine #9)

which have Doors To close For visits. That it WAS

Ex 85, Page 1466

#7

As well as others. Because if an inmate should open a door to both #1 or #9. I am covered in a self protection report rather than assult.

I was then told "Do you see anyone your afraid of? At this point I thought I'm being set up. Or these deputies do not know a thing about whats going on!

And could not answer that question at that time, in that place, with others around!

I was then advised to go ahead to both #9. Where upon half way reaching the said both, was again told, NO, go to both #2.

At which time I went to booth #2. To explain to my wife "Brenda Marlow" why I had to cancel the visit. which I did shortly thereafter.

My wife at this time told me that she had told the deputies at the front visiting desk, that I was a lock down inmate. And that this was out of the norm, of the last (four #4) months.

At which time she was treeted as if she were a lier.

I then left the visit. To go back to

-3-

J-3 cell #ONE - #1

I AGAIN ADVISED THE Deputies To LOCK DOWN The sector UPON MY RETURN To help Them As well As Myself... AND At which Time The sector was locked DOWN UPON My RETURN.

Respectfully
James H. Marlow
#1140812
IRC  J-3 cell #1

Miss Smith.

AS you KNOW, AND have heard FROM Deputies here I have BEEN NO PROBLEM - I have IMPROVED VERY much while here.

HOWEVER I DO WORRY VERY much ABOUT TRiAL STARTING - NEWSPAPERS AND such - I WORRY ABOUT THE SAN BERNARDINO JAIL TROUBLES STARTING ANEW HERE; IN ORANGE COUNTY JAIL. INVOLVEING Deputies AND INMATES..

AND I DO KNOW THAT MY DEFENSE TEAM UNDERSTANDS why I THINK THE WAY I DO! FAMILY has copy's OF JAIL AND CDC FILE'S. WE ALSO NEED + REPORT OF THIS INFO BEING GIVEN TO ORANGE COUNTY JAIL OVER OURSELVES IN A Legal MANNOR should THINGS START

DECEMBER 1/8/90

Ray L. Craig, Attorney                          JAIL INCIDENT
505 N. Arrowhead Ave, Ste 307
San Bernardino, CA
Telephone (714) 888-3747

Defense Team:

On Saturday 1/6/90 this Investigator received a telephone call
from Inmate Marlow and Mrs Marlow regarding a breach of security
which occurred on Saturday 1/6/90 swing shift at I.R.C.

According to Mr. Marlow when his wife came to the county jail
to visit him, he was let out of his cell while other inmates were
also out of their cells.  Mr Marlow was not escorted to his visit.
He was then directed to go to the visiting area #2 which is next
to other inmates who are visiting.  When Mr. Marlow attempted to
explain to the officer that he was to visit in booth #1 or #9 due
to his P.C. status he was told to go to the visiting are #2.  Again
Mr. Marlow was not escorted or supervised during this portion of
the visit.

Due to the breach of security, this Investigator immediately
telephoned I.C.R and asked to speak with the Watch Commander.  Dept
D. Garcia informed this investigator that the watch commander was
at dinner and would return my call.  The watch commander never
returned my call,  I made two more attempts to contact him by
telephone which meet with negative results.

On 1/8/90 this investigator telephoned Sgt Von Voight at (714)
647-6099 at the Orange County Jail, I.R.C. unit.  The above incident
was explained to Sgt Von Voight who stated that he would "take care"
of the situation.  This investigator went on to request a meeting
with Sgt Von Voight for Tuesday 1/9/90 to provide him with
additional information on Mr. Marlow's problems during his trial
in San Bernardino County.  Sgt Von Voight would not set a time for
this investigator to meet with him although he did state he would
be available on 1/9/90, and I should just request to see him upon
arrival at I.R.C.

On 1/9/90 this investigator traveled to the O.C.Jail, upon
arrival at the jail this investigator went to the I.R.C. unit and
asked to speak with Sgt Von Voight.

EXHIBIT "9"

Ex 85, Page 1469

MARLOW CONTINUED
PAGE 2

When Sgt Von Voight arrived this investigator provided him with a copy of this Investigators interview with Arnold Porter, a San Bernardino County Jail report by Sgt Bonnet, Dr, Kania's report dated 12/4/88 and a partial copy of Mr. Marlow's California Dept of Corrections file.

Sgt Von Voight assured this investigator that all parties involved in the incident on Saturday 1/6/90 had been informed of the breach of security. Sgt Von Voight went on to ask this Investigator if any of the inmates from S8C.J. were scheduled to be transferred to the O.C.J.? I was unable to provide Sgt Von Voight with an answer, but did inform him that it could be any inmate that could endanger inmate Marlow's life.

Sgt. Von Voight was also informed of the problems that arose after Mr. Marlow's case was publicized in the newspapers and that we can foresee this occurring again.

Sgt. Von Voight assured this investigator that they will do everything they can to keep Mr. Marlow safe.

This concludes this report

Respectfully,


Patti Smith
Vic Jones Investigation Services

cc: file

02-28-90

Patti Smith, Investigator
Vic Jones Investigation Services
A California Corporation
3666 University Avenue, Suite #206
Riverside, California  92501

Defendant:   JAMES GREGORY MARLOW
             Orange County Jail
             Booking # 1140812

Subject:   Jail Housing Problems

        On 2-27-90 this Investigator recieved a telephone call from
defendant, James Gregory Marlow.  Mr. Marlow was concerned about
his safety due to recent events that have occured in his housing
unit at the Orange County Jail, I.R.C. facility.

        According to Mr. Marlow since the shift change that occured
at I.R.C. several of the new deputies have failed to keep Mr.
Marlow seperate from the other inmates.  Mr. Marlow has attempted
to resolve this problem on his own, by notifying deputies of his
status.  To date this has failed to resolve the problem.

        Following Mr. Marlows last court appearence, 2-22-90, his
Co-defendant Cynthia Coffman threatened Mr. Marlow.  Recently a
new inmate was housed in I.R.C. in the same area of that facilty
in which Mr. Marlow is housed.  This inmate is Jimmy Stewart, who
claims he is out-to-court from Folsom State Prison.  Mr. Stewart
informed Mr. Marlow that he was mainline at Folsom, yet in I.R.C.
he is housed in protective custody.  Another new inmate to I.R.C.
is Henry Mara who is of mexican decent.  Mr. Mara made a comment
to Mr. Marlow about "people being after Mr. Marlow".  Since that
encounter Mr. Marlow has learned that Mr. Mara and Mr. Stewart
have known eachother since childhood.

        On 2-28-90 this Investigator asked to speak with Sgt. Von Voight
the classification sergeant regarding the aforementioned incidents.
Sgt. VonVoight has been aware of Mr. Marlows custodial problems
since his arrival in the Orange County Jail.  I have met with Sgt.
VonVoight on several occasions to discuss problems as they arose.
Prior to Mr. Marlows arrival in the Orange County Jail Sgt Von
Voight was provided with documentation from the San Bernardino Co.
Jail indicating Mr. Marlows custodial status.  Yet when I asked to
speak with Sgt. VonVoight, the visiting officer telephone the Sgt.
who asked the officer to let me talk with him on the telephone.
At that time I requested that the Sgt. come to the lobby so I could
discuss the aforementioned, Sgt. VonVoight insisted on discussing
this matter via the telephone.  There is no privacy at the front
desk of the I.R.C. visiting lobby, as all incoming persons check
in with staff at that location.  I explained the situation to Sgt.
VonVoight who stated he would look into Mr. Stewarts background to
determine if there could be any problems with him housed near Mr.
Marlow.  Sgt. offered no solution to the problem of new deputies

EXHIBIT "10"

PAGE TWO
DEF: MARLOW
Jail Housing Problems

allowing Mr. Marlow to be placed in a compromising and even
dangerous position.  Or that there could be a possiblity of
Mr. Mara being affliated with the Mexican Mafia.

GEORGE A. PETERS                              REPORT BY
ATTORNEY AT LAW
1010 N Ross street                   BRENDA MARLOW, LEGAL RUNNER
Suite 200
Santa Ana california.92701


Defendent:  JAMES GREGORY MARLOW
            Orange County Jail
            Booking# 1140812

Subject:   Jail Housing Problems


On 4-1-1990 This Legal Runner called classification and spoke with a
officer named McGovern about a problem between deputy HERRERA and MARLO
this deputy continues to allow other inmates out on the tear while jame
is out of his cell, even though he has asked him several times not to.
this Legal Runner has also been on the phone with mister marlow on thes
times.
deputy McGovern said that he could only do so much and that i would
have to go one step further than him because he is not aware of everything
that goes on in the jail.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
I then went on to ask about a conversation between a deputy Miller and
inmate DEHOYOS who is housed in MOD-J SECTOR-3 CELL#8 deputy Miller sai
that all the other sectors were going to be filled up befor sec-3.
i then asked how could they screen who they put next to james if all
the sectors are filled, he said that it makes no difference who is house
in sector-3 because they don't have that many other inmates that meet tl
same status as mister marlow, and that they don't screen them anyway.
I then asked him about a conversation we had befor when mhe said that tl
did, he did not recall saying this .
then i told McGovern the main reason i called was because james had just
called and deputy herrera let another inmate out while he was on the
phone talking to mme this caused james to get very upset, herrera just
laughed and said got a problem marlow, and then cut the phones off.
deputy McGovern said he would go check on james and the problem, that he
would take care of it right away.
we then ended the call.


EXHIBIT "11"

*Cenire 'c*

April 8, 1990


Patti Smith, Investigator
Vic Jones Investigation Services
3666 University Ave., Suite 206
Riverside, CA.  92501

Defendant:   JAMES GREGORY MARLOW
             Orange County Jail
             Booking # 1140812

Subject:   Jail Housing Problems

        On April 6, 1990 this Investigator traveled to the Orange
County Jail for the purpose of meeting with defendant, James
Gregory Marlow, Booking# 1140812.

        According to Mr. Marlow the jail housing problems are not
being resolved, to the contrary they are increasing in severity
and frequency.  Mr.Marlow has attempted to resolve these problems
with the deputies on his unit, by reminding them that he is to be
"total seperation" and is not to be out of his cell when other
inmates are out of thier cells.

        Due to these problems this Investigator has attempted to
work with the jail system by addressing the Deputies and the
sergeants with these problems as they arise.

        Then on April 7, 1990 this Investigator recieved a telephone
call from Mr.Marlow stating that Deputy Herrera had told Mr.Marlow
that he was letting Inmate Tommy Hosey, Booking #1149665 Cell#4
out of his cell while Mr. Marlow was on the telephone.  Mr.Marlow
again reminded Deputy Herrera that he was total seperation and
would lock-down prior to anyone being removed from a cell.  Due
to Deputy Herrera being the regular deputy on that unit, it was
my belief that he would be aware of Mr.Marlows status.  It was
for that reason that I contacted Deputy Peterson in Classification
to report the incident.  Deputy Peterson asured me that he would
speak with Inmate Marlow, and Deputy Herrera or his supervisor
so this would not occure agian.

        I also explained to Deputy Peterson some of the other problems
Mr.Marlow has had with Deputy Herrera.  These problems have added
to the friction between Mr.Marlow and Deputy Herrera.

        Then on April 8, 1990 this Investigator recieved another
telephone call from Mr.Marlow and Mr.Marlows wife regarding an
incident that had just occured.  Mr.Marlow was talking with his
wife on the telephone when Deputy Herrera let another inmate out
while Mr.Marlow was out of his cell on the telephone with his
wife.  Mr.Marlow yelled at Deputy Herrera that he was not to be
out while other inmates are out.

Page Two
Jail Incident 4-8-90

      In an attempt to have the jail staff made aware of this
breach of security and the continued breach of security by one
deputy, Deputy Herrera. I contacted the Watch Commander, who
stated that I should be able to reach a deputy in classification
to assist me with this problem.   I then telephoned the class-
ification unit,who stated that neither Deputy McGovern or Deputy
Peterson were at the unit.   The Deputy did ask if he could take
my telephone number and have Deputy McGovern return my call.

      At approximately 4:30 pm Deputy McGovern returned my call.
He explained that he had already spoken with Mr.Marlow and that
the problem had been resolved.

      This concludes this report.

1  JAMES GREGORY MARLOW
   Orange County Jail
2  550 North Flower Street
   Santa Ana, California 92703

3

4  Defendant In Pro Per



F I L E D

APR 27 1990

GARY L. GRANVILLE, Court Clerk

BY_____ DEPUTY

5

6

7          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8              IN AND FOR THE COUNTY OF ORANGE

9

10  THE PEOPLE OF THE STATE OF CALIFORNIA, )    CASE NO:  C-65640
                                           )
11                             Plaintiff,  )    EX-PARTE APPLICATION
                                           )    FOR ORDER TO THE
12  -v-                                     )    ORANGE COUNTY SHERIFF
                                           )    DEPT/JAIL
13  JAMES GREGORY MARLOW,                   )
                                           )
14  _____ Defendant. )  In-Camera Proceeding

15

16          COMES NOW, the defendant, JAMES GREGORY MARLOW, moving the

17  the court for an order directing the Orange County Sheriffs

18  Department/Orange County Jail, I.R.C. Facility to insure said

19  defendants custodial status of Protective Custody/Total

20  Segration is inforced by any and all custodial staff members.

21       It is imparitive that all custodial staff members be alerted

22  to said defendants custodial status, therefore eliminating

23  the possibility of an error.

24       Said Ex-Parte Application is based upon the attached

25  declaration, reports from court appointed investigator and

26  handwritten accounts of incidents as they occured.

27  DATED: 4/27/90

28                                   _____
                                        JAMES GREGORY MARLOW

EXHIBIT "7"

Case3:10-cv-01417-EMC   Document10   Filed06/15/10   Page45 of 65

## DECLARATION OF JAMES GREGORY MARLOW

COMES NOW, your declarant, JAMES GREGORY MARLOW, who hereby declares as follows:

I am charged in the Information with violation of Penal Code Section 187, Murder with Special Circumstances being alleged by the Orange County District Attorney. Due to the fact that my co-defendant is the first female to be sentenced to death in the State of California, this case has recieved a great deal of publicity.

Prior to my arrival in Orange County, the San Bernardino County Sheriffs Department had varification that my life was being threatened by the Mexican Mafia as well as other prison gangs. This conspiracy also involved at least one or more deputies from the San Bernardino County Jail. The aforementioned documentation was presented to the Orange County Jail Classification Sergeant VonVoight via my court appointed investigator, Patti Smith.

Upon my arrival at the Orange County Jail, classification your declarant in the I.R.C. Facility, with a Protective Custody Total Segregation custodial classification.

For several months there were almost no problems regarding my total segregation. On or about December 1989 there was a shift change within the institution. A new group of deputies were assigned to the living units.

Since these deputies were new to the housing units minor errors in keeping me totally segregated were thought to be a simple oversight.

After several months pasted it became apparant that the

1  only time a breach of security occured was when a certain deputy
2  was working my housing unit.  In an attempt to resolve this
3  problem I spoke directly to Deputy Herrera, badge number 115
4  this met with negitive results.

5      In February 1990 my investigator spoke with Sergeant Von
6  Voight regarding the breaches of security (see report dated
7  2-28-90).  In March 1990, my investigator spoke with Deputy
8  Peterson in Classification regarding an inmate who had made
9  reference to being affilated with a prison gang, who was housed
10 with your declarant in I.R.C..  Following that contact the
11 classification did a check of the inmates background and then
12 relocated him to another sector of the facility.

13     These problems have continued to increase in frequency
14 and in severity.  Once agian, my investigator attempted to
15 resolve these problems with jail personnel (see report dated
16 4-8-90).  Due to the security breach on 4-7-90, and then on
17 4-8-90 my investigator contacted the Acting Captian Lt. Davis.
18 Lt. Davis assured my investigator that he would investigate
19 the allegations and attempt to resolve same.  Shortly after
20 learing that Ms. Smith had spoken with Lt. Davis, while out
21 of my cell Deputy Herrera told another inmate over the loud
22 speaker that he could not let him out of his cell while I was
23 in the dayroom...adding..."Marlows scared".  This is the type
24 of behavior which creates hositlity toward my fellow inmates
25 as well as deputies.

26     On 4-9-90 your declarant was escorted to an office where
27 the housing sergeant questioned me regarding Deputy Herrera.
28 The office had several deputies present and it was difficul

-2-

1  to express myself clearly.  Upon my return to the housing unit

2  Deputy Herrera made the following statement, "look out he doesn't

3  trust anybody".

4      Your declarant is informed, believes and thereon alleges

5  that it is essential to my saftey and security that the Court

6  intercede in my behalf by means of a Court Order directing

7  the Orange County Sheriffs Department and the Orange County

8  Jail, I.R.C. Facility to insure that I am kept in Protective

9  Custody/Total Segregation.

10     I declare under penalty of perjury under the laws of the

11 State of California that the foregoing is true and correct.

12     Executed this 27ᵀᴴ day of April, 1990 in Santa Ana,

13 California.

14

15

16                                    JAMES GREGORY MARLON
                                      Defendant In Pro Per

17

18

19

20

21

22

23

24

25

26

27

28

-3-

June 9, 1990


Mr. George Peters
Attorney at Law
1010 North Ross Street, #200
Santa Ana, California 92701


Re:  James Gregory Marlow
     Jail Housing Problems


To whom it may concern:

On 6/9/90 Mr. Marlow called this legal runner after he over heard
another inmate say that Deputy Herrera was asking the other inmates
if they wanted to have day room with others.  This matter concerns
us because this is an entirely separate unit.  But the inmates'
reponse was, "No, thanks."  Mr. Marlow proceeded to say that an
inmate named Mike Taylor, who has Protective Custody at the Main
Jail and who is trying to go to the IRC under Protective Custody,
believes it is because of his co-defendant, Ms. Coffman.
Apparently, Mr. Taylor has been writing to her for about nine
months and has made many comments about breaking Ms. Coffman out
of jail.

Mr. Taylor used to be a <u>red band</u>, which is a high powered inmate.
Mr. Marlow feels he has reason to believe Mr. Taylor may try to
make a hit on him for Ms. Coffman because of her past attempts.

<u>June 10, 1990</u>

Mr. Marlow called me over the telephone and during our conversation
a class Deputy by the name of McGovern asked inmate Andrew Anderson
if he wanted to have day room with inmate Brent McMannon, who is
also a former police officer.  They are both known for homosexual
activities.  Mr. Anderson said that this was an entirely segregated
unit and that if they wanted him to have contact with others then
they should put him in a populated area.  Mr. Anderson added that
he liked things the way they are and appreciated Deputy McGovern's
offer but he would have to refuse it.

<u>June 11, 1990</u>

Inmate Anderson called this legal runner to advise that Deputy
Herrera let inmates Anderson and Dave Brown out at the same time
and that he was offering everybody day room except Mr. Marlow.
Deputy Herrera refuses to let Mr. Marlow out while he is on duty.
Mr. Marlow has also given this legal runner a signed letter from

1

Jail Housing Problems
Re:  James Gregory Marlow

inmate Riley Jones stating that Deputy Herrera offered to leave Mr.
Jones' door open while inmate Brown was having his day room, in
case inmate Jones wanted to do anything to inmate Brown.

Inmate Anderson also stated that Deputy Herrera makes comments
about Mr. Marlow being afraid of the other inmates.

After my telephone conversation with Mr. Marlow I called Lt.
Ratchford to inform him of this problem. Lt. Ratchford stated that
he would talk to the inmates and try to settle this matter and
would later call me back.

This concludes this portion of the report.


Brenda Marlow
Legal Runner

2

August 3, 1990


Mr. George Peters
Attorney at Law
1010 North Ross Street, #200
Santa Ana, California 92701


Re:  James Gregory Marlow
     Jail Housing Problem


To whom it may concern:

At approximately 10:30 pm, an underline orange band inmate by the name of
Welch, was housed in the IRC, J-6, cell #1.  The inmate told inmate
David A. Brown who is housed in J-6, cell #6 that he was down from
the "Joint" and had come to the Orange County Jail from Los Angeles
County Jail.   Inmate Welch admitted he was a red band in Los
Angeles and a member of Aryan Brotherhood..  Inmate Welch informed
inmate Brown that he had killed a Lieutenant's son and met the
Aryan Brotherhood people while serving time.  Inmate Welch believes
he was put under Protective Custody because he was stabbed by the
Aryan Brotherhood people.

With shift change taking place this month it seems too easy for
open door mistakes to occur in the Total Separation Housing Unit
of J-6.  Why is Housing Classification placing a well known Aryan
Brotherhood member who has contracts from this gang, as well as
other well known prison gangs, on inmate Marlow's life, around
inmate Marlow?  It appears to be a direct set up to have inmate
Marlow hit because Housing Classification knows about these gang
hits on inmate Marlow and yet they house an orange band, who claims
to be a member of the Aryan Brotherhood, in Module J-6, Protective
Custody and Total Separation Housing Unit.

At 10:45 inmate Marlow was escorted into J-6 Housing Unit after on
his way back from a legal visit by a new deputy without first
locking down inmate David A. Brown.   This kind of negligence
cannot occur in a Total Separation Protective Custody Housing Unit.
There is a court order filed for total Separation of inmate Marlow
from all inmates, including and mainly gang members.

Due to the Total Separation Order and the report of the stabbing
of inmate Arnold Porter, which we believe occurred as a result of
being placed next to inmate Marlow in order to make a hit, we are
extremely concerned about the prison gangs such as Aryan
Brotherhood, Mexican Mafia, or dropouts and/or affiliates.

1

Jail Housing Problems
Re:  James Gregory Marlow

Please investigate this matter and inform us of the situation and
the reasons for not following the orders of the Court in keeping
inmate Marlow in Total Separation.


Brenda Marlow
Legal Runner

2

November 2, 1990

Mr. George Peters
Attorney at Law
1010 North Ross Street, #200
Santa Ana, California 92701

Re:  James Gregory Marlow
     Jail Housing Problem

To whom it may concern:

This legal runner recieved a telephone call from inmate James
Marlow in Mod. J, Sector 6, regarding an inmate named Mara who had
just been put in the cell next to Mr. Marlow's.  Mr. Marlow
established that this is the same inmate that he had had a problem
with at the beginning of the year and that he was on Mr. Marlow's
entire separation order.  Mr. Marlow stated that there must be big
mistake and asked if I could please investigate it.

At about 9:30 pm I spoke with Sergeant Boyer about the Mara
problem.  I reminded him about the court order that this inmate was
not supposed to be anywhere near Mr. Marlow.  Sergeant Boyer
replied that he would personally investigate the matter and would
return my call.

At 9:50 pm Mr. Marlow called me again on the telephone and said that
a Sergeant and a Deputy had just been to Mr. Marlow's cell and Mr.
Marlow had explained the situation to them.  The Sergeant stated
that it could take two days to straighten out the problem.  Mr.
Marlow then asked me to hold the line for a moment while he locked
down.  When Mr. Marlow came back to the telephone he informed me
that the officers had already moved inmate Mara to another sector.
We then terminated our conversation.

At about 11:30 pm Sergeant Boyer returned my telephone call and
stated that the problem had been resolved and that he was sorry for
any trouble caused.  I thanked him and ended the telephone call.

Brenda Marlow
Legal Runner

1

EXHIBIT "16"

copy Lawyer ✓
     Jail ✓
     Runner ✓

11-3-90

I spoke with Deputy MCGOVERN FROM Class
Detal about an inmate stringfellow's wish To Be how
in J-6 due To inmate stewart & mara named
on Total sep court order. Being in IRC J-3
with stringfellow. For some time. it was my
concern that MR. stringfellow might Be used &
someone Trying To make a Hit. On myself or
another inmate. On 11-27-90 stringfellow did
attack inmate Pazewits. in sector J-3.

    And is now Total sep status himself in J-
while now inmate Pazewits is in sector J-6.

    My concern was weather or not mr.
stringfellow would be moved To J-6 in The
    Future, if inmate Pazewits was moved To
another housing unit?

    Inmate stringfellow had spoken To inmate R. Richard
J-6. And stated that he was trying To get housed
in J-6 sometime in the Future.

                    Very respectfully

                              James G. Marlow
                              1140812
                              I.R.C. J-6 #2

EXHIBIT "17"

Ex 85, Page 1485

November 4, 1990


Mr. George Peters
Attorney at Law
1010 North Ross Street, #200
Santa Ana, California 92701


Re:  James Gregory Marlow
     Jail Housing Problem


To whom it may concern:

This legal runner recieved a telephone call from inmate Marlow and
during our conversation I heard another inmate yelling and calling
inmate Marlow a "snitch" and that he was going to kill him if he
ever got out at the same time.  When I asked Mr. Marlow what all
the yelling was about and Mr. Marlow answered that the inmate's
name was Birchfield and is housed in Mod. J, Sector 6, and called
him a "loud mouth punk".  Mr. Marlow stated that the yelling and
calling of names happens all the time and requested that I keep a
record of this particular incident.   We then terminated our
conversation.

I called the watchcommander's office at approximately 9:00 pm and
spoke with Lieutenant Wilkerson about the threats on inmate
Marlow's life.  I also explained that because of the open door
problems in the past we are concerned that if it doesn't get
resolved and inmate Birchfield attacks inmate Marlow, I don't want
inmate Marlow to be blamed for hurting inmate Birchfield.
Lieutenant Wilkerson insisted that there is no safer place for
inmate Marlow but he assured me that he would look into this
matter.  It should be noted that Lieutenant Wilkerson appeared to
have a very short temper.  I then terminated the conversation with
Lieutenant Wilkerson's promise that he would call me back the same
night with some results.

November 5, 1990

At approximately 2:00 pm I called Lieutenant Wilkerson as he did
not call me the night before as he had promised.  Lieutenant
Wilkerson stated that he went down to the "Bubble" to talk to the
deputy on duty and he was told that inmate Birchfield "was a big
mouth and no threat to anyone."  Lieutenant Wilkerson stated that
I had said that they had let inmate Birchfield out while inmate
Marlow was out.  I replied that this was not true and that all I
said was that if the problem of letting the door open reoccurred,
I didn't want inmate Marlow to get blamed for any harm to
Birchfield.

1


EXHIBIT "18"

Jail Housing Problems
Re:  James Gregory Marlow

At this point Lieutenant Wilkerson reacted in an extremely rude manner and when I asked him why he was acting so mad and that I would have to speak directly to Lieutenant Ratchford.  Lieutenant Wilkerson replied, "Fine!  He is right here."  I told Lieutenant Wilkerson that I would call Lieutenant Ratchford at his office for more privacy and terminated the phone call.  I then called Lieutenant Ratchford and his secretary said that he was on another line and also confirmed that Lieutenant Ratchford had been in his office the whole time.  At that time I called the watchcommander and asked to speak with Lieutenant Wilkerson but he was out to lunch.  I asked the deputy on duty if Lieutenant Ratchford had been there and when the deputy said no, I replied, "tell Lieutenant Wilkerson he's a liar."  I then terminated our phone conversation.


Brenda Marlow
Legal Runner


2

November 13, 1990

Mr. George Peters
Attorney at Law
1010 North Ross Street, #200
Santa Ana, California 92701

Re:  James Gregory Marlow
     Jail Housing Problem

To whom it may concern:

At approximately 8:30am, this legal runner called Vanda Bresnan at
Superior Court regarding a problem of harassment in the Orange
County Jail by Deputies Hyatt, Humphrey and Nester on 11/11/90.
Deputy Nester was making a scene at the lobby searching my
briefcase in front of several people.  After the search, Deputy
Humphrey approached me to inform me that Deputy Nester was
following his orders because "Marlow is a dangerous kind of guy."
But yet, less than a week before this incident, Deputy Humphrey
allowed a CST worker pass supplies through without inspection, and
remained in the "Bubble."

I also explained to Deputy Humphrey that on 11/10/90, when I was
in the Lobby, Deputy Hyatt asked me if I needed help.  I refused
his aid and went up to my visit.  Twenty minutes later, Deputy
Hyatt, along with another Deputy whose name I do not know, came
over to the visiting booth and asked if I was Mrs. Marlow.  When
I said, "Yes," Deputy Hyatt asked to see my identification, as some
people do not carry identification when visiting the inmates.  I
showed Deputy Hyatt my identification and he examined it for some
time.  Then he gave it back and asked what I had in my briefcase.
When I began to open it to show him the contents, Deputy Hyatt
grabbed his club, as if I was going to pull out a weapon from the
briefcase.   He then looked briefly at the contents and left.
Afterwards, I called Sergeant Boyer and explained that I have been
coming to the Orange County Jail for approximately one year and
never had any problems.  Sergeant Boyer said he was going to notify
Lieutenant Ratchford and suggested that I also contact him on
Tuesday.  On 11/12/90, I was informed that Deputy Herrera called
from Main Control and ordered the search every time I came to the
Jail to visit inmate Marlow.

1

Jail Visit Problem
Re:  James Gregory Marlow

It should be noted that Deputy Herrera was moved out of the IRC for offering other inmates to be out while inmate Brown was in Sector J.  We strongly believe that Deputy Herrera is the cause for all these problems.  Vanda Bresnan assured me that she would investigate this matter.


Brenda Marlow
Legal Runner

2

November 18, 1990


Mr. George Peters
Attorney at Law
1010 North Ross Street, #200
Santa Ana, California 92701


Re:   James Gregory Marlow
      Visiting Booth Incident


To whom it may concern:

On today's date this legal runner visited inmate James Marlow at
the IRC, booth #1.  As I was entering the booth I noticed that both
passing windows had been left open.  As inmate Marlow was about to
enter the booth I pointed to the passing windows.  Inmate Marlow
inspected the outer entrance to the passing area confirming it had
also been left unlocked.  Inmate Marlow informed Deputy Mays, who
was the deputy on duty, about the error and he acknowledged.  A few
minute later, Deputy Mays returned to lock all the doors.  When
inmate Marlow asked what was happening, Deputy Mays replied, "It's
temptation, Marlow.  It wasn't I.  It must have been the shift
before."

It should be noted that Deputy Humphrey was on duty when this
incident occurred.  This concludes this report.


Brenda Marlow
Legal Runner


1

# M E M O R A N D U M

TO:       George Peters

FROM:     Alfredo Rasch

DATE:     February 16, 1991

SUBJECT:  JAMES MARLOW
          File No.:  90-169

---

In mid December, 1990, I delivered a Transportation Court Order on the case of Martin Rodriguez at the Orange County Sheriff's Department, which is located behind the IRC, so we could have witness Miguel Mora transported from Chino Prison back to the Orange County Jail.

While I was there I encountered a deputy whom I had known before when he was a bailiff at the Courthouse and we would engage in conversations. This was the second or third time that I had seen this deputy there since I've been taking Transportation court orders to the Transportation Department of the Orange County Sheriff's Department. Later on I learned that the last name of this deputy is Norwood, and I believe his first name might be Glen.

While Susan, the Transportation Department clerk was handling my court order, Deputy Norwood and I conversed about what we are doing nowadays and how busy we are, and I told him about some of the cases that I'm working on, and incidentally I mentioned James Marlow as being one of my clients. At this point Deputy Norwood began laughing and stated that a few weeks earlier, Deputy Norwood had been the driver of the bus which transports inmates from the courthouse back to the jail. On that day, Deputy Norwood made a stop, which I don't recall if it may have been at The Farm, Theo Lacy, Main Jail or the IRC. Deputy Norwood established that he had to get off the bus and when he returned, James Marlow, who happened to be one of the passengers, was being harassed by some "butch looking" female inmates. They were screaming and spitting at inmate Marlow, and threatening him, saying they were going to "cut him," until Deputy Norwood came over and basically told the prisoners to keep quiet.

<div align="center">1</div>

**Memo**
Re:  James Marlow

Deputy Norwood added that this type of incidents don't happen too often and that inmate Marlow was handcuffed and his feet were shackled.  Deputy Norwood did not give me any more details about the incident, but I will try to contact him and obtain more information.  I have notified James Marlow, Brenda Marlow, Vanda, and George Peters about the incident.

2



hey Sicko,

I write several guys over there in J and all 3 of them tell me your the sorryest PC over there. All us girls read about your case - you really are a piece of shit. Cynthia says you were a sorry fuck also. Bald with a tiny dick. Its just as well your going to get gassed !!!! Our whole dorm is helping compose this, so its unanimus - we figured we'd let you know that we all know your the lowest of the P.C.s We are told your a coward with the heart of a mouse, and your a rat to boot. Why dont you do everyone a favor and hang yourself.

Thank god you will NEVER torture another female again - We're also acquired your wife/legal runners address and will be dropping her a line - do you really suck cock over there - Im sure your family is real PROUD of you - kids, family + wife -

Are you still getting drugs over there "speed on paper" Im told that it is going to stop real soon.

Anyhow Dirtbag - dont want to waste too much ink on your pathetic ass - so this will be short - do you really walk like HOWDY DOOTY.???

Everybody gets a kick out of your name all over the court tanks - your talked about real bad - deserve every bit of it too. Its been fun, got to run, just wanted to let you know, everybody thinks your the worst piece of shit imaginable.

Write back, so when they EXECU - your filthy Snaggletooth ass, we can frame your letter and CELEBRATE.

Later barf bag
Jody and the girls

M E M O R A N D U M

TO:          George Peters

FROM:        Alfredo Rasch

SUBJECT:     JAMES GREGORY MARLOW
             Our File No:  90-169

DATE:        February 28, 1991

---

On today's date, I met with Ricky Bruce Richards, Booking No.
1257420, date of birth 5/31/66 at the IRC.  Mr. Richards is housed
in Mod. J, section 6, same as our client, Mr. Marlow.  Mr. Richards
is described as a 25 year old male caucasian.

Mr. Richards informed me that on January 11, 1991 as he was en
route to West Court he was placed downstairs in a special holding
cell designated for inmates on their way to their appointed court
rooms.  Mr. Richards added that another inmate known as "Bullet"
Nelson was in the same holding cell.  A few moments later, Mr.
Marlow walked by in what Mr. Richards described as a funny manner
as Mr. Marlow had been handcuffed and shackled.  At that moment
"Bullet" Nelson got up from his seat, looked out from the cell and
turned towards Mr. Richards and asked, "Who was that?  Who was
that?"
        - Mr. Richards answered, "That was Marlow."
        - "Is that Jim Marlow?"
        - "Yes."
        - "Is he the one who's here for having killed two girls with
a co-defendant who's a chick or a broad?"
        - "Yes."
        - "Uh... do you know where he uh, he's housed?  What uh, mod.?
What section?"
        - "He's with me."
        - "What can you tell me about him?"
Bullet Nelson began inquiring of Mr. Richards several things
regarding Mr. Marlow.  At this point Mr. Richards clammed up and
refused to answer any more questions regarding Mr. Marlow, as Mr.
Richards claims there has been a contract on Mr. Richard's life.

Mr. Richards stated that Bullet Nelson and himself remained in the
cell together for a while and engaged in different conversations

EXHIBIT "23"

but eventually Mr. Nelson would come back to Mr. Marlow. Mr. Richards felt that Bullet Nelson was "pumping" him, trying to get any information regarding Mr. Marlow, which made Mr. Richards become suspicious.

Mr. Richards established that at the first opportunity he had, which may have been on the same day, he addressed Mr. Marlow about Bullet Nelson's inquiries, explaining the type of questions he was asked. Mr. Richards added that Bullet Nelson admitted previously to being a "made man", which Mr. Richards interpreted as a person who does contract killings.

Mr. Richards stated that he had forgotten about the incident with Bullet Nelson, until a few days later when Bullet Nelson was transferred from his housing in Mod. J, sector 5, which is the sector adjacent to sector 6, where Mr. Marlow and Mr. Richards are housed, and was placed in a cell right next to Mr. Marlow. At this point Mr. Marlow complained to the authorities and Bullet Nelson was moved out from that cell to a different location within 48 hours.

Mr. Richards claims that he is not a "friend" of Mr. Marlow, as they just happened to meet in jail. Mr. Richards also claims that he doesn't know much about Mr. Marlow, and the reason he is giving me all this information is because he just wants to be neutral. Mr. Richards informed me that his next court date is March 8, 1991, in Dept. 73, as he will be given credit for all the time he has been in custody, and he believes that he will be released a few days after then.

I served Mr. Richards with a subpena for March 8, 1991, and Mr. Richards stated that he would be happy to testify, but he doesn't want it to conflict with his own court appearance. Mr. Richards would be willing to testify after his case is taken care of in his courtroom, as he is afraid he may lose his court appearance on that date. Mr. Richards stated that he wants to get out of jail as soon as possible and said, "If you guys do that, I'll be very angry." (By this statement Mr. Richards means that if our subpena makes him lose his own court appearance.)

Mr. Richards would like us to have him transported first to West Court and afterwards to Central Court if we need him to testify. Otherwise, he doesn't want to be taken to Central Court and miss his court appearance the same day. Mr. Richards claimed that all the information he gave me is the truth, and that he will be more than happy to testify, and he gave me an address where he can be contacted, if we need him in the future: 10101 Flanner Dr., Garden Grove, 92640, telephone (714) 530-7694, which is the residence of his mother-in-law, Mrs. Murray.

Mr. Richards added that his Public Defender in West Court is Don Ronaldson.